**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
AT BOSTON**

|  |  |
|---|---|
| MARISA CLOUTIER BRISTOL,   )<br>  )<br>  Plaintiff,   )<br>  )<br>v.   )<br>  )<br>WOMEN & INFANTS' FERTILITY CENTER,   )<br>WOMEN & INFANTS' HOSPITAL OF   )<br>RHODE ISLAND,   )<br>  )<br>  Defendants.   ) |  |

**PLAINTIFF'S COMPLAINT**

INTRODUCTION

This case arises out of IVF treatment by the defendants Women & Infants' Fertility Center and Women & Infants' Hospital of Rhode Island (collectively referred to herein as "Women & Infants'") and the negligence of Women & Infants' and its agents, servants, and employees in failing to inform the plaintiff Marisa Cloutier-Bristol and her first husband John Cloutier, who has since deceased, of the existence of a frozen embryo in Women & Infants' continuous possession for over 13 years.  This tragic mistake prevented Mrs. Cloutier-Bristol, now 45 years old, from having a child with her husband before he passed away in 2006.

The defendants also failed to obtain Mrs. Cloutier-Bristol and her deceased husband's consent as to what to do with the frozen embryo in the event of his death.  Consequently, this embryo, a potential child for Mrs. Cloutier-Bristol, must remain frozen for eternity.  Its continued existence, and the knowledge of the child she might have had, is a source of constant emotional distress for Mrs. Cloutier-Bristol.

1

## PARTIES

1. The plaintiff Marisa Cloutier-Bristol resides at 108 Division Street, North Attleboro, Massachusetts.

2. The defendant Women & Infants' Fertility Center is a fertility clinic with a principal place of business located at 90 Plain Street, Providence, Rhode Island. It is affiliated with Women & Infants' Hospital of Rhode Island.

3. The defendant Women & Infants' Hospital has a principal place of business at 101 Dudley Street, Providence Rhode Island and is registered to conduct business in the Commonwealth of Massachusetts.

## JURISDICTION

4. This Court has personal jurisdiction over the Defendants under G.L. c. 223A, § 3, because: (i) the defendants transacted business in Massachusetts in connection with soliciting business and patients who reside in Massachusetts; (ii) the defendants caused tortious injury to the plaintiff in Massachusetts by acts or omissions in Massachusetts; and/or (iii) the defendants caused tortious injury to the plaintiff in Massachusetts by acts or omissions outside Massachusetts and each defendant regularly does or solicits business in Massachusetts, derives substantial revenue from services rendered in Massachusetts, and/or otherwise engages in a persistent course of conduct in Massachusetts.

5. Moreover, the plaintiff has specific jurisdiction pursuant to the Due Process clause of the 14th Amendment based on the fact that the defendant has requisite minimum contacts with, and is registered to do business in, the Commonwealth of Massachusetts and thereby purposefully avails itself of the privileges of doing business in Massachusetts.

## FACTS

6. Since approximately 1986, Women & Infants' has offered *in vitro* fertilization (IVF) among other treatments to assist couples in getting pregnant.

7. IVF is a fertility treatment in which a woman's egg and a man's sperm are combined outside the woman's body *in vitro* (Latin for "in glass"), i.e. in a laboratory petri dish in order to achieve fertilization. After growing the fertilized egg (embryo) for several days in an incubator, one or several or more embryos can then be placed in a woman's uterus to achieve a pregnancy.

8. If IVF treatment is successful, the embryo will implant in the uterus and result in a pregnancy. Any remaining embryos can be cryopreserved (frozen and stored) for future use or donated to other couples.  IVF can overcome most causes of male and female infertility.

9. IVF has a high rate of success because it allows for a controlled interaction of eggs and sperm. Approximately 60,000 babies are born per year through the use of IVF or other assisted reproductive technologies, according to a report released in 2017 by the U.S. Society of Assisted Reproductive Technology (SART).

10. In 2003, the plaintiff Mrs. Cloutier-Bristol (then 30 years old) and her first husband, John Cloutier (since deceased), went to Women & Infants' for IVF treatment.

11. They met with Dr. Kelly Pagidas.

12. Dr. Pagidas agreed that she would not cancel an IVF cycle even if she was able to obtain only one egg.

13. They then underwent three IVF cycles between November 2003 and April 2004.

14. During the third cycle, four embryos were created, three of which were nonviable.

15. One of the embryos they created was frozen by Women & Infants' in April 2004.

16. Unfortunately, Mrs. Cloutier-Bristol and her husband John were told that all four embryos were abnormal and were never informed of the existence of a frozen embryo.

17. There is no documentation confirming that they were ever aware of or agreed to the existence or the disposition of any frozen embryos.

18. As a result, unaware of their frozen embryo and another chance at a baby, they decided to stop attempting to conceive via IVF.

19. Tragically, Mr. Cloutier died suddenly from a heart attack in 2006 – never learning of the opportunity to have another child before he passed away.

20. Three years went by until 2008 when Mrs. Cloutier-Bristol (35 at the time) returned to Women & Infants' with Michael Bristol (her current husband) for IVF treatment.

21. Unfortunately, a limited number of follicles were produced in her ovaries during stimulation and treatment was cancelled.

22. Once again, Dr. Pagidas and Women & Infants' failed to inform her of the existence of the cryopreserved egg.

23. Once again, she was not presented with the option of what to do with the egg at that time.

24. The Women & Infants' file contains a "Frozen Embryo Report" that confirms the facility was aware of the frozen embryo at the time Mrs. Cloutier-Bristol returned for fertility treatment in 2008-2009.

25. It also contains an email chain between Jeannine Witmyer and Dr. Pagidas which indicates that the Women & Infants' was aware of the frozen embryo. According to an

email dated January 22, 2009, Marisa had "not yet decided its destiny yet." Dr. Pagidas was to "keep [Mrs. Witmyer] posted" with regard to this frozen embryo.

26. However, neither Mrs. Cloutier-Bristol nor her first or second husband were ever informed of the existence of this frozen embryo.

27. There is no documentation of any such discussion or any follow up phone calls to determine what she had decided with regard to the remaining frozen embryo.

28. Eight years later, in August, 2017, Mrs. Cloutier-Bristol received a letter at home in Massachusetts from Women & Infants' informing her for the first time that they had a frozen embryo on storage.

29. Mrs. Cloutier-Bristol called back that same day, presuming it was sent in error as part of a mass mailing. She left a message asking for someone to call her back as soon as possible.

30. A woman named "Gina" from Women & Infants' called her back and confirmed that the letter only went out to patients that had frozen embryos. It was not a mass mailing to all fertility patients. Gina stated that they had a "new policy" and were no longer storing embryos free of charge and only started billing for frozen embryos in 2016.

31. This was untrue. Mrs. Cloutier-Bristol and her second husband Michael signed an "Agreement for Freezing Embryos" in 2009 that confirmed that a storage fee would be charged after one year. The "Agreement for Freezing Embryos" they signed with Women & Infants' in January 2009 expressly states that they would have options available to them after one year from the date of the egg retrieval. The Agreement states in paragraph 4:

> The Couple acknowledges and agrees that the frozen embryo(s) will be

stored for one (1) year from the date of the egg retrieval from Patient at no charge. The Couple understands that the options at the end of this one (1) year storage period may include:

    a. Transferring the embryo(s) back to Patient.

    b. Attempting to offer them for donation or research.

    c. Having them removed from storage and discarded.

    d. Extending the storage at an additional charge of $500 per year.

The Agreement also states that the embryos may be discarded by the hospital for failure to pay the $500 storage fee or to contact the hospital's Cryogenic Coordinator. Unfortunately, Women & Infants' indisputably waited eight years before contacting Mrs. Cloutier-Bristol to inform her of the fact that they had another frozen embryo in storage. While the Agreement also implies that Mrs. Cloutier-Bristol was to contact the hospital before the expiration of one year, this Agreement does not apply to the frozen embryo created with John Cloutier in 2004. Moreover, Women & Infants' efforts in contacting her eight years later, in August 2017, prior to discarding the embryo, substantiates that they assumed the duty to contact the patient regarding her options, a duty that they ignored for many years.

32. This policy was in place for a long time, and Women & Infants' failure to notify Mrs. Cloutier-Bristol was a gross mistake, one that prevented her from having a chance at a live-birth pregnancy for 8 years.

33. Mrs. Cloutier-Bristol was shocked and disturbed to learn that there was a frozen embryo

and told Gina that she was never aware that she had any frozen embryos. She further explained that her first husband had passed away and she would have used any frozen embryos had she known she had any. She asked her how many embryos they had of hers, which Gina (shockingly) did not know and told her that she would contact the lab and call her back with more information.

34. On September 8, 2017, Mrs. Cloutier-Bristol called back because she still had not heard back from Gina.

35. On September 13, 2017, Mrs. Cloutier-Bristol called again, because she still had not heard back.

36. Finally, on September 14, 2017, Mrs. Cloutier-Bristol spoke with Gina who informed her that she had one frozen embryo.

37. Mrs. Cloutier-Bristol expressed how upset she was to find out this information after all this time.  She told her once again that she had no idea that she ever had any frozen embryos. She explained her history of her first husband passing away and that she had even come in for a cycle with her new husband and it was never mentioned that she had anything frozen at that time. Gina again stated that this was a new policy this year, regarding the billing. Gina did not apologize and told her about her options and she also stated that she was "not the only person who was shocked to find out" this information.

38. The failure of Women & Infants' to obtain Mr. and Mrs. Cloutier's written consent with regard to what should be done with the frozen embryo is a deviation from the existing standards of care and a serious breach of medical ethics.

39. Specifically, the standard of care in 2003 and 2004 required that the ART facility and the physician obtain the couples' informed consent to determine what is to be done with the cryopreserved embryo in case of such events as divorce, separation, or death.

40. This is a long-established requirement of the American Society for Reproductive Medicine.

41. Additionally, the failure to inform them of the actual existence of the frozen embryo is a significant deviation from the standard of care and a breach of medical ethics.

42. It is indisputable that had Mrs. Cloutier-Bristol and her former husband John been informed of the existence of this, they would have attempted another pregnancy. Therefore, the negligence of Women & Infants' has deprived her of the opportunity to have another child.

43. Unfortunately, Mrs. Cloutier-Bristol cannot now have it transferred because it would effectively make John Cloutier, although deceased, a parent without his consent and against his will. Therefore, Mrs. Cloutier-Bristol is now prohibited by medical ethics from discarding, donating or transferring the embryo. Her only option is that it must be cryopreserved for eternity.

44. If the embryo had been transferred, more likely than not it would have resulted in a live birth pregnancy based on documentation maintained by Women & Infants' that confirms that the embryo is viable.

45. The viability of this embryo is further supported by the fact that Women & Infants' kept it frozen for 15 years and is currently charging Mrs. Cloutier-Bristol $500 per year to store it. It would be unconscionable for them to charge her for the preservation of an embryo that is, in fact, not viable.

46. Mrs. Cloutier-Bristol (now 45) is presently tortured with the knowledge that she could have had an opportunity for another child before her husband passed away when she was only 33 years old.  At her current advanced age, she has a much lower chance of pregnancy and a much higher risk of miscarriage with implantation.

47. Knowing that a potential child has existed for 13 years, but is now unable to be created, causes her unrelenting emotional trauma.  Mrs. Cloutier-Bristol is tormented by the knowledge that the embryo is still frozen at Women & Infants' - a constant reminder to her of what could have been.

48. Even if she were permitted to have the embryo transferred to her (which medical ethics prohibits) Mrs. Cloutier-Bristol would be at a much higher risk due to her advanced maternal age.

49. Even if consent of her first husband John can be assumed (which it cannot), and the frozen embryo is transferred resulting in a live birth pregnancy, over 13 years have transpired from 2004 when the egg was cryopreserved until she was informed of it in 2017 thereby depriving her of another child for 13 years.

50. Mrs. Cloutier-Bristol never received a call from anyone at the Women & Infants' about this incident to counsel her about her options and the impact it may have on her.

51. At no point was Mrs. Cloutier-Bristol offered the opportunity to speak with one of the physicians to counsel her through this dilemma.

52. The defendants have completely failed to appreciate that they had a potential life form in their presence and ignored the sensitivity and psychological impact of this tragic mistake on their patient.

53. No one ever offered an apology or acknowledged responsibility for their mistake.

## COUNT I

### BREACH OF INFORMED CONSENT

54. The plaintiff incorporates by reference all previous and subsequent paragraphs.

55. The defendants had a duty to disclose to Mrs. Cloutier-Bristol and her husband John Bristol in a reasonable manner all significant medical information that they recognized or reasonably should have recognized was material to their decision with regard to conceiving via IVF and with regard to their decision to cryopreserve any embryos.

56. The defendants and their agents, servants, and employees negligently failed to inform the plaintiff and her deceased husband John Cloutier of the alternative of having the frozen embryo transferred to the plaintiff to create a possible pregnancy rather than having it cryopreserved.

57. The defendants and their agents, servants, and employees also negligently failed to inform the plaintiff and her deceased husband John Cloutier of the options with regard to the cryopreserved embryo in the event that one of them passed away and to obtain their consent as to the disposition of the embryo in the event one of them died while the embryo was cryopreserved.

58. Had Mrs. Cloutier-Bristol and John Bristol been informed of this alternative/option, they would have chosen to have the embryo transferred to the plaintiff and would not have consented to cryopreserving the embryo for 13 years until she became 44 years old.

59. As a result of their failure and breach of informed consent, the defendants and their agents, servants, and employees denied Mrs. Cloutier-Bristol and John Bristol material information to enable them to make an intelligent choice as to the frozen embryo and thereby violated the Plaintiff's right to self-determination.

60. As a result of their failure and breach of informed consent, the plaintiff was caused to suffer the loss of a chance of a child and corresponding severe emotional trauma.

## COUNT II

### BREACH OF CONTRACT

61. The plaintiff incorporates by reference all previous and subsequent paragraphs.

62. The acts and conduct of the defendants and their agents, servants, and employees here in above alleged were in breach of their contractual agreements between them and Mrs. Cloutier-Bristol, such that they are liable to Mrs. Cloutier-Bristol for the consequential and incidental damages suffered by her as a result of that breach.

## COUNT III

### PROFESSIONAL NEGLIGENCE

63. The plaintiff incorporates by reference all previous and subsequent paragraphs.

64. A relationship of physician/patient existed between the defendants and their agents, servants, and employees at all times relevant to the matters complained of herein, pursuant to which relationship the defendants and their agents, servants, and employees owed Mrs. Cloutier-Bristol a duty of professional care.

65. The acts and conduct of the defendants and their agents, servants, and employees constituted professional negligence on the part of both the defendants and their agents, servants, and employees in their utter failure to properly inform, consult or otherwise treat and obtain the informed consent of Mrs. Cloutier-Bristol and the decedent John Cloutier as their patients in connection with cryopreservation of their embryo.

66. Mrs. Cloutier-Bristol has suffered the damages described hereinabove as the direct and proximate result of the professional negligence of the defendants and their agents, servants, and employees as aforestated.

## COUNT IV

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

67. The plaintiff incorporates by reference all previous and subsequent paragraphs.

68. The negligent acts, conduct and omissions complained of by the defendants and their agents, servants, and employees directly resulted in the infliction of severe emotional distress on the part of Mrs. Cloutier-Bristol, which is reflected in physical symptomology and which has required, and will continue to require, her medical and psychological treatment therefor indefinitely.

## COUNT V

### VICARIOUS LIABILITY/RESPONDEAT SUPERIOR

69. The plaintiff incorporates by reference all previous and subsequent paragraphs.

70. The defendants are vicariously liable for the negligence of their agents, servants, and employees including but not limited to Dr. Kelly Pagidas, which negligence caused Mrs. Cloutier-Bristol's damages.

WHEREFORE, The plaintiff Marisa Cloutier-Bristol demands judgment from the Court as follows that:

(a)   judgment enter for the plaintiff Mrs. Cloutier-Bristol against the defendants and their agents, servants, and employees;

(b)   damages, including attorneys' fees and costs be awarded to the plaintiff Mrs. Cloutier-Bristol on all counts in such amounts as shall be determined by the Court after trial; and

(c)   for such other and further relief as the Court deems just and proper in the circumstances.

### JURY CLAIM

**THE PLAINTIFF DEMANDS A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE.**

The Plaintiff,

MARISA BRISTOL

By her Attorneys,

/s/ Jeffrey N. Catalano

Jeffrey N. Catalano (BBO #567798)

jcatalano@toddweld.com

Todd & Weld LLP

One Federal Street

Boston, MA 02110

(617) 720-2626

Dated: 01/28/19

4817-6324-2880, v. 1